1

2

3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACIA CHEVANNESE YOUNG, et al., | Case No. 20-cv-07183-EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND DENYING DEFENDANTS' MOTION TO TRANSFER** |
| DONALD J. TRUMP, et al., | |
| Defendants. | Docket Nos. 8, 18 |

        Plaintiffs are 181 U.S. citizens and lawful permanent residents ("LPR's") who have immediate family members with an approved immigrant visa petition from United States Citizenship and Immigration Services ("USCIS").  These family members seek to complete the visa process and enter the United States to unite with their family as sanctioned by long standing immigration laws.  However, President Trump has issued two Presidential Proclamations banning the entry into the United States of all aliens as immigrants, with certain narrow exceptions, in response to the domestic economic crisis caused by the COVID-19 pandemic.  Docket No. 1.

        Plaintiffs bring this action against President Donald J. Trump, Secretary of State Michael R. Pompeo, and Acting Director of Homeland Security Chad F. Wolf, challenging these Proclamations and the Department of State's implementation of them.  Plaintiffs allege, *inter alia*, that the Proclamations are *ultra vires* because they do not contain the predicate factual findings for the President to suspend the entry of aliens under 8 U.S.C. § 1182(f); that they violate the Constitutional separation of powers by abrogating the carefully reticulated scheme for family-based immigration under the Immigration and Nationality Act ("INA"); and that the Department of State's implementation of the Proclamations violates § 706(2) of the Administrative Procedure

Act ("APA") by preventing the issuance of immigrant visas to applicants who are otherwise eligible.

Before the Court is Plaintiffs' Motion for Preliminary Injunction (Docket No. 8) and Defendants' Motion to Transfer pursuant to the first-to-file rule or 28 U.S.C. § 1404(a) or, alternatively, for a stay (Docket No. 18).  The Court has considered the parties' papers, relevant legal authority, the parties' arguments at the motion hearing, and the full Certified Administrative Record ("CAR") provided by Defendants (Docket No. 1-1).  For the reasons that follow, the Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction and **DENIES** Defendants' Motion to Transfer.

## I.      FACTUAL BACKGROUND

A.      <u>April and June Presidential Proclamations</u>

On April 22, 2020, President Trump announced and executed Presidential Proclamation 10014 ("April Proclamation") titled "Suspension of Entry of Immigrants Who Present a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak."  85 Fed. Reg. 23,441 (Apr. 27, 2020); CAR at 1.  In the Preamble to the April Proclamation, the President determined that the United States faces a protracted economic recovery, with excess labor supply outpacing demand and historically marginalized workers (*e.g.*, racial minorities and those without a college degree) bearing the brunt of that excess labor supply. CAR at 1.  The Preamble claims that the April Proclamation seeks to protect these workers in light of the "open market" employment authorization documents issued to LPRs admitted to this country (under the family-based immigrant visa system), as they are immediately eligible to compete for scarce jobs at the expense of struggling American workers.  *Id.*  In light of the purportedly inevitable harm which this legal immigration poses to the American workforce, the Preamble concludes that "[e]xisting immigrant visa processing protections are inadequate for recovery from the COVID–19 outbreak."  *Id.*

Citing the President's authority under 8 U.S.C. § 1182(f) and § 1185(a) of the Immigration and Nationality Act ("INA"), the April Proclamation Preamble finds "that the entry into the United States of persons described in section 1 of this proclamation would, except as provided for

United States District Court
Northern District of California

in section 2 of this proclamation, be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions." CAR at 2. Section 1 provides as follows: "[t]he entry into the United States of aliens as immigrants is hereby suspended and limited subject to section 2 of this proclamation." *Id.* Section 2 enumerates the exceptions to the Proclamation, *e.g.*, for aliens seeking entry to combat the spread of COVID-19 (such as a physician, nurse, or other healthcare professional) or those whose entry is deemed to be in the national interest. *See* CAR at 2-3. The April Proclamation lasted for 60 days, and directed three cabinet secretaries (the Secretaries of Labor, Homeland Security, and State) to "review nonimmigrant programs and … recommend to [the President] other measures appropriate to stimulate the United States economy and ensure the prioritization, hiring, and employment of United States workers." CAR at 3.

Two months later (on June 22, 2020), the President issued Proclamation 10052, a renewing Proclamation ("June Proclamation"). 85 Fed. Reg. 38,263; CAR at 5. The Preamble to the June Proclamation notes the quadrupling of the unemployment rate in the United States between February and May 2020. CAR at 5. It then states the following: "pursuant to Proclamation 10014 [the April Proclamation], the Secretary of Labor and the Secretary of Homeland Security reviewed *nonimmigrant* programs and found that the present admission of workers within several nonimmigrant visa categories also poses a risk of displacing and disadvantaging United States workers during the current recovery." *Id.* (emphasis added). The Preamble provides examples of the ways in which American workers lose jobs in industries seeking to fill worker positions tied to nonimmigrant visas. CAR at 5-6. For instance, the Preamble states that between February and April 2020, upwards of 17 million U.S. jobs were lost in industries in which employers were seeking to fill worker positions with workers entering the country on H-2B nonimmigrant visas. *Id.* During that same period, more than 20 million U.S. jobs were purportedly lost in industries where employers were filling such positions with workers admitted under H-1B and L nonimmigrant visas. CAR at 6. Therefore, the entry of additional workers "through the H–1B, H–2B, J, and L nonimmigrant visa programs … presents a significant threat to employment opportunities for Americans affected by the extraordinary economic disruptions caused by the

COVID–19 outbreak."  CAR at 6.

Citing the President's authority under 8 U.S.C. § 1182(f) and § 1185(a) of the INA, the June Proclamation extends the suspension of entry for aliens with *immigrant* visas through December 31, 2020, and Section 1 provides that the Proclamation may be continued "as necessary" after that date.  CAR at 6.  The suspension of immigrant visas is not expressly predicated on the Secretary of Labor and Secretary of Homeland Security's findings noted above. In Section 2, the June Proclamation also suspends the entry of foreign nationals seeking admission on temporary nonimmigrant visas, with certain limited exceptions provided for in Section 3.  CAR at 6-7.  Section 4(a)(i) instructs the Secretary of State to implement the June Proclamation, as it applies to visas, pursuant to such procedures as he may establish in consultation with the Secretary of Homeland Security and the Secretary of Labor (*e.g.*, by promulgating standards to determine which aliens are covered by the "national interest" exception).  CAR at 7.

B.   Immigration Visa Application Process

Generally speaking, a foreign national who wishes to enter the United States must first obtain a visa from the U.S. Department of State ("DOS").  A visa is a travel document that confers upon its recipient the right to travel to a port of entry and apply for admission to enter the United States, but it does not guarantee a right of entry.  *Almaqrami v. Pompeo*, 443 U.S. App. D.C. 52, 54, 933 F.3d 774, 776 (2019); *Zadvydas v. Davis*, 533 U.S. 678, 693, 121 S. Ct. 2491, 2500 (2001) (explaining that "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law").

There are two categories of visas: immigrant and nonimmigrant.  Nonimmigrant visas are issued to foreign nationals seeking to enter the United States on a temporary basis, *e.g.*, for tourism, business, medical treatment, or certain kinds of temporary work.  Included in this category are various temporary worker visas affected by the June Proclamation, *e.g.*, H-1B visas (occupations in fields requiring highly specialized knowledge), H-2B visas (workers performing non-agricultural labor or services on a temporary or seasonal basis), J visas (exchange visitors working as professors, scholars, or teachers), and L visas (intra-company transferees seeking to work at a branch, parent, or affiliate of their current employer in a managerial capacity).  *See*

United States District Court
Northern District of California

Directory of Visa Categories, U.S. DEPARTMENT OF STATE.[1]  Immigrant visas, by contrast, are issued to foreign nationals who intend to live and work permanently in the United States. *Requirements for Immigrant and Nonimmigrant Visas*, U.S. CUSTOMS AND BORDER PROTECTION (Jan. 3, 2018).[2]  Such visas are issued, for instance, to spouses, children, and other immediate family members of U.S. citizens.  In most cases, a relative or employer sponsors the immigrant visa applicant by filing a petition with USCIS.

Counsel for Plaintiffs described the process for obtaining an immigrant visa at the motion hearing, which is also described in DOS's Foreign Affairs Manual ("FAM") and the INA.  *See generally* 9 FAM 504.1-3 ("IV Application Processing").  First, a U.S. citizen or LPR files an I-130 petition with USCIS on behalf of their relative.  After that I-130 is approved, the application moves to the National Visa Center ("NVC"), where the documents necessary for the adjudication of the visa are collected.  Visa applicants are required to submit a variety of forms which confirm their identity and eligibility.  *See* 22 C.F.R. § 42.65(b) ("[a]n alien applying for an immigrant visa shall be required to furnish, if obtainable: A copy of a police certificate or certificates; a certified copy of any existing prison record, military record, and record of birth; and a certified copy of all other records or documents which the consular officer considers necessary"); 8 U.S.C. § 1202(b) ("[e]very alien applying for an immigrant visa shall present a valid unexpired passport or other suitable travel document, or document of identity and nationality … [and] shall furnish to the consular officer … a copy of a certification by the appropriate police authorities stating what their records show concerning the immigrant; a certified copy of any existing prison record, military record, and record of his birth; and a certified copy of all other records or documents concerning him or his case which may be required by the consular officer").

The visa applicant then fills out the Form DS-260 with biographical and work information, and the completed form is sent to the embassy in the country where the applicant resides.  9 FAM

---

[1] Available at https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/all-visa-categories.html.

[2] Available at https://www.cbp.gov/travel/international-visitors/visa-waiver-program/requirements-immigrant-and-nonimmigrant-visas.

United States District Court
Northern District of California

504.1-3 at a.(2) ("Definition of 'making an immigrant visa application'") (each applicant must "submit a completed Form DS-260 for formal adjudication by a consular officer" and must affirm, under threat of criminal penalty, that all of the information provided on the Form and during the interview is true). The consulate post of that country then reviews the application. The applicant undergoes a medical evaluation, and then a two-part interview. During the first part of the interview, the consular officer ascertains whether the applicant qualifies for their intended visa category (*e.g.*, if they are the spouse of a U.S. citizen, the officer would verify that they have a bona fide marriage). During the second part of the interview, the consular officer conducts a criminal background check and goes through the admissibility checklist prescribed by the INA. 9 FAM 504.1-3 at f. ("Interview") ("[d]ecisions to issue or refuse an immigrant visa application must be based on a personal interview, during which the consular officer must ensure that all required documentation has been provided, that there is a legal basis for the applicant to immigrate, and that there are no ineligibilities that would affect visa issuance").[3]

Once the interview is complete, the FAM and the INA direct consular officers to *adjudicate* the visa application. 9 FAM 504.1-3 ("IV Application Processing") at g. ("Adjudications") ("[o]nce an application has been executed, the consular officer must either issue the visa or refuse it. *A consular officer cannot temporarily refuse, suspend, or hold the visa for future action*") (emphasis added); 8 U.S.C. § 1202(b) ("[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular officer"); *see also* 22 C.F.R. § 42.81(a) ("[w]hen a visa application has been properly completed and executed before a consular officer in accordance with the provisions of the INA and the implementing regulations, the consular officer must issue the visa, refuse the visa under INA 212(a) or 221(g) or other applicable law or, pursuant to an outstanding order under INA 243(d), discontinue granting the visa").

C.    <u>Diplomacy Strong</u>

Neither the April nor the June Proclamation expressly upends this carefully prescribed

---

[3] The INA establishes multiple grounds by which an alien abroad may be deemed ineligible to receive a visa and be admitted to the United States. *See, e.g.*, 8 U.S.C. § 1182(a)(1) (health-related grounds for exclusion); (a)(2) (criminal history grounds); (a)(3) (national security grounds).

United States District Court
Northern District of California

United States District Court
Northern District of California

process for the adjudication of an immigrant visa application and the issuance of an immigrant visa to an applicant whose application was approved.  Instead, the Proclamations suspend the "*entry*" of aliens under immigrant and non-immigrant visas, subject to certain limited exceptions.  *See* April Proc. § 1 (CAR at 2); June Proc. § 2 (CAR at 6).  Nonetheless, the Department of State ("DOS") has halted the processing, adjudication, and issuance of visas in the impacted categories during the time the Proclamations have been in effect.

The timeline for the DOS's decision was as follows.  After the World Health Organization declared the COVID-19 outbreak to be a pandemic in March 2020, the Office of Management and Budget at the White House sent out a general memorandum, directed to all federal agencies, with instructions to "take appropriate steps to prioritize all resources to slow the transmission of COVID-19, while ensuring our mission-critical activities continue."  Opp. at 2.  In response to the OMB directive, DOS suspended all routine visa services worldwide, *e.g.*, by suspending the scheduling of immigrant visas by the NVC and cancelling visa appointments at consular posts.  Opp. at 2-3; *see also* DeGarmo Decl. ¶ 2.  Despite the suspension of routine visa services, consular posts continued to provide "mission critical or emergency services," provided it was safe.  Opp. at 3; *see also* Marwaha Decl. ¶ 2.  DOS defines "mission critical services" as "the processing of certain non-immigrant visas, such as those for diplomats and government officials, temporary agricultural workers, medical professionals, air and sea crew, and applicants with medical emergencies."  Opp. at 3.

In May 2020 (shortly after the enactment of the April Proclamation), DOS released what it calls the "Diplomacy Strong" framework, a phased approach to the resumption of in-person operations in a safe and secure manner.  *Id.*; *see also* DeGarmo Decl. ¶ 3.  As part of this framework, DOS publicly announced on July 14, 2020 that U.S. embassies and consulates would begin a phased resumption of routine visa services on a post-by-post basis.  *See* Marwaha Decl. ¶ 4; CAR at 190 (DOS's public announcement).  DOS sent out a cable to All Diplomatic and Consular Posts ("ALDAC") with guidance "to inform post decisions on which visa services they choose to resume during each phase of Diplomacy Strong and depending on the specific conditions at each post."  *See* July 8, 2020 ALDAC (CAR at 35).  The Diplomacy Strong phases

United States District Court
Northern District of California

only provide for the resumption of processing for immigrant visa applications which are *exempted* from the Proclamations.  *See* July 8, 2020 ALDAC, CAR at 36 (providing guidance for Diplomacy Strong Phases Zero and One and noting that, "[s]ince Presidential Proclamation (P.P.) 10014 *suspending issuance of certain immigrant visas* has been extended through at least December 31, posts should prioritize the cases that may fall under an exception to P.P. 10014") (emphasis added) and 38 (under Diplomacy Strong Phase Three, "posts may resume routine services for all IV [immigrant visa] classes and cases excepted under P.P. 10014 [the April Proclamation]").  In other words, DOS interpreted the Proclamations as suspending not only the entry of aliens subject to its provisions, but also the *processing* and *issuance* of visas to these aliens even when conditions would otherwise allow for the processing of these visas.  The DOS ordered a categorical injunction against the processing of visas even though there is no express language in the Proclamations requiring such.  To have their immigrant visa applications processed under Diplomacy Strong, applicants had to meet two criteria: (1) they must fall within one of the exceptions to the Proclamations, *e.g.*, the national interest exception, *and* (2) their case must be deemed "mission critical" or an "emergency."  Marwaha Decl. ¶ 6.

D.    Visa Categories at Issue

Plaintiffs have immediate family members with approved immigrant visa petitions under the family-based immigrant visa program.  Under this program, a U.S. citizen or LPR may sponsor a foreign-national relative (the "beneficiary") for an immigrant visa.  *See* 8 U.S.C. §§ 1151(a)(1), 1153(a).  The sponsor may also petition for certain relatives ("derivatives") of the principal beneficiary.  8 U.S.C. §§ 1153(d), 1154(a).  The INA prescribes certain "preference allocations" by which immigrants in each category are allotted a certain number of visas per fiscal year.  *See* 8 U.S.C. § 1151(a)(1), (2), (3), and (4).

Plaintiffs commonly allege (1) that "[their] [b]eneficiaries' visa applications have been suspended and have been withheld issuance of their visas due to unlawful 'mission critical' and 'emergency' requirements for adjudications and issuance" and (2) that  "[their] [b]eneficiaries' visa applications have been suspended and have been withheld issuance of their visas under the 'Diplomacy Strong' Policies."  *See* Compl. ¶¶ 20-1144 (common contentions in the last two

paragraphs for each named Plaintiff).  Plaintiffs have family members who are immediately

eligible for the adjudication and issuance of their immigrant visa applications pursuant to the

October 2020 DOS Visa Bulletin.[4]  Docket No. 8-37.  They fall into the following categories.

### 1. IR-2

IR-2 visas are allocated to the unmarried children of U.S. citizens who are under the age of

21 at the time of filing.  Beneficiaries in this category are considered immediate relatives not

subject to any statutory numerical limitations.  Compl. ¶ 1160; *see also* 8 U.S.C. §

1151(b)(2)(A)(i) (including "immediate relatives," within the sub-section for aliens not subject to

direct numerical limitations and defining "immediate relatives" as the children, spouses, and

parents of U.S. citizens).  Plaintiffs allege that, under DOS's Diplomacy Strong Framework, the

processing, adjudication, and issuance of visas under this category is "suspended and withheld if

the child turns 21 despite remaining otherwise eligible."  Compl. ¶ 1161.  Although the

Proclamations exempt children of U.S. citizens, there is a risk that certain children will age out

and lose eligibility as a result of the Proclamation.  (*See* discussion *infra*.)

### 2. IR-5

IR-5 visas are allocated to the parents of adult U.S. citizens.  These beneficiaries are

considered immediate relatives not subject to any statutory numerical limitations.  Compl. ¶ 1162;

*see also* 8 USCS § 1151(b)(2)(A)(i) (including "immediate relatives," within the sub-section for

aliens not subject to direct numerical limitations and defining "immediate relatives" as the

children, spouses, and parents of U.S. citizens).  Plaintiffs allege that, under DOS's Diplomacy

Strong Framework, the processing, adjudication, and issuance of visas under this category is

suspended.  Compl. ¶ 1163.

### 3. F1

F1 visas are allocated to the unmarried adult children of U.S. citizens.  This is the top tier

---

[4] At the motion hearing, Plaintiffs' counsel noted that there is some variability with respect to the stages at which Plaintiffs' beneficiaries find themselves.  For instance, for some beneficiaries, NVC is reviewing their papers, while others have proceeded further along and are merely waiting for an interview with a consular officer.  Nonetheless, both parties agreed that all Plaintiffs have an approved I-130 petition and are immediately eligible for the adjudication and issuance of their visas pursuant to the October 2020 Visa Bulletin.

United States District Court
Northern District of California

of the family preference allocation framework.  Under the INA, Congress has mandated that 23,400 visas be allotted to visa applicants in this category per fiscal year.  Compl. ¶ 1164; *see also* 8 USCS § 1153(a)(1) ("[q]ualified immigrants who are the unmarried sons or daughters of citizens of the United States shall be allocated visas in a number not to exceed 23,400, plus any visas not required for the class specified in [the fourth preference category, for siblings of U.S. citizens]").  Plaintiffs allege that, under DOS's Diplomacy Strong Framework, the processing, adjudication, and issuance of visas under this category is suspended.  Compl. ¶ 1165.

### 4.   F2A & F2B

F2A and F2B visas are allocated to the spouses and children of LPR's.  This is the second tier of the family preference allocation framework.  Under the INA, Congress has mandated that 114,200 visas be allotted to visa applicants in this category per fiscal year.  Compl. ¶ 1166; *see also* 8 USCS § 1153(a)(2) ("[q]ualified immigrants—(A) who are the spouses or children of an alien lawfully admitted for permanent residence, or (B) who are the unmarried sons or unmarried daughters (but are not the children) of an alien lawfully admitted for permanent residence, shall be allocated visas in a number not to exceed 114,200, plus the number (if any) by which such worldwide level exceeds 226,000, plus any visas not required for the class specified in [the first preference category, for unmarried adult children of U.S. citizens]; except that not less than 77 percent of such visa numbers shall be allocated to aliens described in subparagraph (A)").  Plaintiffs allege that, under DOS's Diplomacy Strong Framework, the processing, adjudication, and issuance of visas under this category is suspended.  Compl. ¶ 1167.

### 5.   F3

F3 Visas are allocated to the married children of U.S. citizens.  This is the third tier of the family preference allocation framework.  Under the INA, Congress has mandated that 23,400 visas be allotted to visa applicants in this category per fiscal year, plus any visas not required for the first and second family-sponsored preference categories.  Compl. ¶ 1168; *see also* 8 USCS § 1153(a)(3) ("[q]ualified immigrants who are the married sons or married daughters of citizens of the United States shall be allocated visas in a number not to exceed 23,400, plus any visas not required for the classes specified in [the first and second family-sponsored preference

United States District Court
Northern District of California

1   categories]").  Plaintiffs allege that, under DOS's Diplomacy Strong Framework, the processing,

2   adjudication, and issuance of visas under this category is suspended.  Compl. ¶ 1169.

3       6.    F4

4       F4 visas are allocated to the siblings of U.S. citizens.  This is the fourth tier of the family

5   preference allocation framework.  Under the INA, Congress has mandated that 65,000 visas be

6   allotted to visa applicants in this category per fiscal year, plus any visas not required for the first

7   three family-sponsored preference tiers.  Compl. ¶ 1170; *see also* 8 USCS § 1153(a)(4)

8   ("[q]ualified immigrants who are the brothers or sisters of citizens of the United States, if such

9   citizens are at least 21 years of age, shall be allocated visas in a number not to exceed 65,000, plus

10  any visas not required for the classes specified in [the first three family-sponsored preference

11  categories]").  Plaintiffs allege that, under DOS's Diplomacy Strong Framework, the processing,

12  adjudication, and issuance of visas under this category is suspended.  Compl. ¶ 1171.

13              **II.      DISCUSSION**

14  A.    First-to-File Rule

15      Defendants move the Court for an order transferring the case at bar to the U.S. District

16  Court for the District of Columbia, pursuant to the first-to-file rule, in light of the pendency of

17  *Gomez v. Trump*, No. 20-cv-01419 (APM) in that judicial district.

18      The first-to-file rule allows a district court to stay its proceedings if a similar case, with

19  substantially similar issues and parties, was previously filed in another district court.  *Kohn Law*

20  *Grp., Inc. v. Auto Parts Mfg. Miss., Inc.*, 787 F.3d 1237, 1239 (9th Cir. 2015); *see also Alltrade,*

21  *Inc. v. Uniweld Prods.*, 946 F.2d 622, 625 (9th Cir. 1991) (the first-to-file rule may be invoked

22  "when a complaint involving the same parties and issues has already been filed in another

23  district").

24      One purpose of the rule is to promote judicial efficiency.  *Church of Scientology v. United*

25  *States Dep't of Army*, 611 F.2d 738, 750 (9th Cir. 1979).  Another purpose is to "avoid placing an

26  unnecessary burden on the federal judiciary, and to avoid the embarrassment of conflicting

27  judgments."  *Id.*  A court analyzes three factors under the rule: chronology of the lawsuits,

28  similarity of the parties, and similarity of the issues.  *Kohn Law Grp., Inc.*, 787 F.3d at 1240.

11

United States District Court
Northern District of California

1      The first-to-file rule does not require exact similarity of the parties.  *Id.*; *see also*

2 *Intersearch Worldwide, Ltd. v. Intersearch Grp., Inc.*, 544 F. Supp. 2d 949, 959 n.6 (N.D. Cal.

3 2008).  Rather, the first-to-file rule only looks to whether there is substantial similarity between

4 the parties.  *Kohn Law Grp., Inc.*, 787 F.3d at 1240.  Further, the issues in both cases "need not be

5 identical, only substantially similar."  *Id.*

6      There are several recognized exceptions to the first-to-file rule: bad faith, anticipatory

7 suits, and forum shopping.  *Alltrade, Inc.*, 946 F.2d at 628; *see also Plating Res., Inc. v. UTI*

8 *Corp.*, 47 F. Supp. 2d 899, 905 (N.D. Ohio 1999) ("[a] district court, in its discretion, may

9 dispense with the first-to-file rule for reasons of equity," *e.g.*, in cases of "bad faith, anticipatory

10 suits, and forum shopping") (internal quotation marks omitted).  Moreover, where the later-filed

11 action has progressed further, efficiency considerations also disfavor application of the rule.

12 *Church of Scientology*, 611 F.2d at 750.  Also, a court may decline to apply the rule "if the balance

13 of convenience weighs in favor of the later-filed action."  *Guthy-Renker Fitness L.L.C. v. Icon*

14 *Health & Fitness, Inc.*, 179 F.R.D. 264, 270 (C.D. Cal. 1998) (internal quotation marks omitted);

15 *see also Ward v. Follett Corp.*, 158 F.R.D. 645, 648 (N.D. Cal. 1994) ("[a] court may also relax

16 the first to file rule if the balance of convenience weighs in favor of the later-filed action")

17 (internal quotation marks omitted).  The first-to-file rule is not a rigid mandate.  It should not be

18 "be mechanically applied, but rather is to be applied with a view to the dictates of sound judicial

19 administration."  *Pacesetter Sys. v. Medtronic, Inc.*, 678 F.2d 93, 95 (9th Cir. 1982).

20      The Court finds it is not appropriate to apply the rule here.  The Second Amended

21 Complaint in *Gomez* does satisfy two of the factors for the rule.  First, the SAC in *Gomez* was

22 filed on August 12, 2020, while the complaint in the case at bar was filed on October 14, 2020.

23 Second, the *Gomez* SAC challenges the same Proclamations (*i.e.*, the April and June

24 Proclamations) under some of the same legal theories, *e.g.*, as violating § 706(2) of the APA and

25 as an *ultra vires* violation of § 1182(f) of the INA.  Docket No. 18-3 (*Gomez* SAC ¶¶ 309-78).

26 And at least some of the plaintiffs in *Gomez* fall within the same visa categories as the *Young*

27 plaintiffs in the case at bar.  For instance, the second sub-class in *Gomez* is defined as follows:

28 "[i]ndividual U.S. citizens with an approved immigrant visa petition for an immediate relative

1   parent and whose sponsored relative is subject to Presidential Proclamation 10052." SAC ¶ 298.

2         However, there is no overlap between named plaintiffs in *Gomez* and *Young*: there are only

3   fourteen named individual plaintiffs in the *Gomez* SAC, and none of these individuals are named

4   plaintiffs in *Young*. The remaining seven named plaintiffs in *Gomez* are all organizations with

5   petitions for *non-immigrant* visas. *See Gomez* SAC ¶¶ 30-36. Moreover, no class has been

6   certified in *Gomez* which encompasses the plaintiffs herein. In this case, in contrast to the handful

7   of plaintiffs in *Gomez*, there are 181 individual Plaintiffs seeking immigrant visas. *See* Plaintiffs'

8   Response to Defendant's Administrative Motion to Expedite Hearing Date at 2 (Docket No. 16)

9   ("Plaintiffs, including [a] nine-year-old child stuck in war-torn Yemen apart from both of his

10   parents, comprise 181 families who are heartbreakingly separated from their loved ones by

11   Defendants' unlawful proclamations, policies, and procedures"). A substantial number of the

12   plaintiffs herein reside in California. This case is focused exclusively on immigrant visas;

13   whereas the primary focus in *Gomez* is on non-immigrant visas.

14         Moreover, another court in this judicial district recently issued an order finding that the

15   Proclamations are unconstitutional as they apply to applicants for non-immigrant visas, directly

16   addressing and differing in the constitutional analysis of *Gomez*. *Compare Nat'l Ass'n of Mfrs. v.*

17   *United States Dep't of Homeland Sec.* ("*NAM*"), No. 20-cv-04887-JSW, 2020 U.S. Dist. LEXIS

18   182267, at *22 (N.D. Cal. Oct. 1, 2020) ("Congress' delegation of authority in the immigration

19   context under Section 1182(f) does not afford the President unbridled authority to set domestic

20   policy regarding employment of nonimmigrant foreigners. Such a finding would render the

21   President's Article II powers all but superfluous") *with Gomez v. Trump*, No. 20-cv-01419 (APM),

22   2020 U.S. Dist. LEXIS 163352, at *77 (D.D.C. Sep. 4, 2020) ("Plaintiffs' effort to characterize

23   the Proclamations' exclusion of aliens in purely or predominately domestic terms therefore runs

24   headlong into Supreme Court precedent … even if Plaintiffs' foreign/domestic dichotomy is a

25   practically feasible one, it does not follow that judicial deference is any less when the overarching

26   purpose for the exclusion of aliens is domestic in nature"). Hence, the interest in efficient judicial

27   administration has already been considerably weakened.

28         Further, the Government did not move to transfer *NAM* to the District of Columbia, despite

United States District Court
Northern District of California

1    the fact that *NAM* and *Gomez* adjudicated the exact same legal issue for the same class of visa

2    holders, even though it had an opportunity to do so.  The Government's inconsistent positions

3    regarding transfer of this case implies that its decision to seek transfer of this case may have been

4    influenced by forum shopping: it seeks a transfer in the case at bar after the *Gomez* court ruled in

5    large part in its favor, but it did not seek a transfer in *NAM* (before the *Gomez* ruling was issued).

6    Finally, given the large number of Plaintiffs herein who reside in California, transfer would

7    impose a burden that counsels against transfer.

8    The Court declines Defendants' motion to transfer this case to the District of Columbia.

9    B.    Standing

10   The Court turns to the "irreducible constitutional minimum" of standing, with its three

11   distinct elements: (1) a concrete and particularized injury-in-fact, which is (2) fairly traceable to

12   Defendants' conduct, and (3) redressable by a favorable court decision.  *Lujan v. Defenders of*

13   *Wildlife*, 504 U.S. 555, 560-61 (1992).

14   The concrete and particularized injury-in-fact which Plaintiffs allege is the complete freeze

15   of their beneficiaries' immigrant visa petitions.  *See* Compl. ¶¶ 20-1144 (common contentions in

16   the last two paragraphs for each named Plaintiff regarding the suspension and withholding of their

17   beneficiaries' visas under Diplomacy Strong).  This is an important procedural right and as

18   discussed herein will result in delay in obtaining a VISA and entry into the United States beyond

19   that caused by the resource limitations attributable to the pandemic.  This injury is fairly traceable

20   to the named Defendants: the President enacted the Proclamations, the Secretary of State directs

21   the federal agency (DOS) which adjudicates immigrant visa applications at consulates worldwide,

22   and the Secretary of Homeland Security is tasked with implementing the Proclamations in tandem

23   with the Secretary of State.  April Proc. § 3 ("[t]he Secretary of State shall implement this

24   proclamation as it applies to visas pursuant to such procedures as the Secretary of State, in

25   consultation with the Secretary of Homeland Security, may establish in the Secretary of State's

26   discretion") (CAR at 3).  As discussed below, the stoppage and delay caused by the Proclamations

27   exceeds and is additive to that caused by the pandemic itself.

28   With respect to redressability, a plaintiff must show that it is "'likely,' as opposed to

14

merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561

(quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 96 S. Ct. 1917, 1924 (1976)).  The

redressability requirement is relaxed, in particular, when the plaintiff claims a procedural injury.

*Wildearth Guardians v. Jewell*, 738 F.3d 298, 305-06 (D.C. Cir. 2013).  When alleging the

deprivation of a procedural right, "instead of needing to establish that compelling the agency to

follow the correct procedure *would* lead to a substantive result that favors the petitioner's concrete

interests, the petitioner need only show that its concrete interests *could* be better protected."

*Narragansett Indian Tribal Historic Pres. Office v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020)

(emphasis in original).  Moreover, redressability does not require a showing that the plaintiff will

obtain complete relief for all injuries alleged.  *New York v. Trump*, No. 20-CV-5770 (RCW)

(PWH) (JMF), 2020 U.S. Dist. LEXIS 165827, at *41 (S.D.N.Y. Sep. 10, 2020) ("[n]otably, the

redressability requirement does not require a plaintiff to show that the relief sought will remedy all

injuries alleged.  Instead, 'the relevant inquiry is whether . . . the plaintiff has shown an injury to

himself that is likely to be redressed by a favorable decision.'  In other words, a plaintiff satisfies

the redressability requirement when he shows that a favorable decision will relieve a discrete

injury to himself.  He need not show that a favorable decision will relieve his every injury.'")

(citing *Larson v. Valente*, 456 U.S. 228, 243 n.15, 102 S. Ct. 1673, 1682 (1982)).  Nor need the

plaintiff show that judicial relief will remedy any one injury entirely, for "[i]t is enough that the

'risk [of the alleged harm] would be reduced to some extent if [the plaintiffs] received the relief

they seek.'" *New York*, 2020 U.S. Dist. LEXIS 165827 at *41-42 (citing *Massachusetts v. E.P.A.*,

549 U.S. 497, 526, 127 S. Ct. 1438, 167 L. Ed. 2d 248 (2007)).

   Defendants contest redressability because DOS's visa backlog predates the April

Proclamation.  The backlog began in March, when DOS operations were scaled back in response

to the pandemic.  As of October 31, 2020, DOS had a backlog of 162,550 documentarily qualified

applicants in immediate relative immigrant visa categories awaiting appointments, including

28,122 applicants in the IR-2 category and 48,256 in the IR-5 category.  Opp. at 2.  Further, in

October 2020, the National Visa Center ("NVC") could schedule only 4,751 interviews for

immediate relative immigrant visa categories, compared to 15,478 immediate relative cases in

1    October 2019, 16,246 in October 2018, and 17,697 in October 2017.  *Id.*  In light of these harsh

2    realities caused by the pandemic, Defendants argue that Plaintiffs' alleged harms are not

3    redressable because visa operations may be suspended at relevant consular posts even if the Court

4    enjoins enforcement of the Proclamations.  Opp. at 8.

5         However, Plaintiffs have met their burden because they have established (1) a procedural

6    injury, and (2) that the relief they request could better protect their concrete interests in the

7    adjudication of their immigrant visa applications.  Plaintiffs are immediately eligible for the

8    adjudication and issuance of their approved immigrant visa petitions, per the October 2020 Visa

9    Bulletin from DOS.  However, consular officials are *categorically* precluded from processing

10   Plaintiffs' immigrant visa applications unless their cases are excepted from the Proclamations,

11   regardless of how far along in the Diplomacy Strong framework a particular country has

12   progressed.  *See* July 8, 2020 ALDAC, CAR at 36-38; *see also* Docket No. 8-5 (email from the

13   U.S. Embassy's Immigrant Visa Unit in Ankara, Turkey, stating the following to an applicant:

14   "[w]e would like to inform you that your administrative processing has been completed.  Due to

15   the Presidential Proclamation 10014 issued on April 22, 2020 and continued by Presidential

16   Proclamation 10052 on June 22, 2020, however, we are not able to process your case").  At oral

17   argument, counsel for Plaintiffs informed the Court that there are 432 beneficiaries of Plaintiffs'

18   immigrant visa applications, who are currently located in 41 different countries.  There is therefore

19   a high probability that at least some Plaintiffs would see meaningful progress in the adjudication

20   of their immigrant visa applications, but for the June Proclamation.  For instance, Plaintiffs

21   contended at the motion hearing that in some countries, such as New Zealand and Vietnam, local

22   conditions have improved and permit for processing of some non-mission critical visas, yet

23   Plaintiffs' visas have not been processed and remained frozen.  *See also* Kadiu Decl. ¶ 5

24   (immigrant visa application for Plaintiff's wife has been frozen in place by Diplomacy Strong, yet

25   "[t]he embassy [in Italy] is open and is conducting interviews for the categories not affected by the

26   proclamation"); Kumar Decl. ¶ 5 (immigrant visa application for Plaintiff's wife has been frozen

27   in place by Diplomacy Strong, and "[t]he interview [with a consular officer] was not scheduled

28   because of the immigration ban, *although the consulates are open in India*") (emphasis added).

1    For Plaintiffs herein, their visa processes are frozen at a standstill.  Not only are they

2    deprived of a valuable procedural right, but when the Proclamations are ultimately lifted, they will

3    have lost valuable time in obtaining their visas, and their entry into the United States will be

4    further delayed.  Thus, Plaintiffs have met the redressability requirement of standing.

5    C.    Preliminary Injunction

6    Under the traditional standard articulated by the U.S. Supreme Court in *Winter*, a plaintiff

7    seeking a preliminary injunction must establish "that he is likely to succeed on the merits, that he

8    is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities

9    tips in his favor, and that an injunction is in the public interest."  *Winter v. NRDC, Inc.*, 555 U.S.

10   7, 20 (2008).  The Ninth Circuit employs an alternative "serious questions" standard (sometimes

11   called the "sliding scale" variation of the *Winter* standard).  *All. for the Wild Rockies v. Pena*, 865

12   F.3d 1211, 1217 (9th Cir. 2017).  Under the sliding scale variation, if a plaintiff "can only show

13   that there are '*serious questions* going to the merits'—a lesser showing than likelihood of success

14   on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips

15   sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied."  *Id.* (emphasis

16   added); *see also Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) ("[t]he Ninth Circuit weighs

17   these factors on a sliding scale, such that where there are only 'serious questions going to the

18   merits'—that is, less than a 'likelihood of success' on the merits—a preliminary injunction may

19   still issue so long as 'the balance of hardships tips sharply in the plaintiff's favor' and the other

20   two factors are satisfied").

21   1.    Irreparable Harm

22   Plaintiffs suffer irreparable harm as a result of the withholding or unreasonable delay in the

23   adjudication and issuance of their family-based immigrant visas, and the consequential family

24   separation and the resulting trauma stemming therefrom.  Mot. at 11.

25   Most obvious are the seventeen beneficiaries who are at risk of "aging out" of their family-

26   based preference categories.  The April and June Proclamations exempt the children of U.S.

27   citizens.  *See* April Proc. § 2(b)(v); June Proc. § 3(b)(ii).  The INA defines a child as a person who

28   is both unmarried and under 21 years old.  *See* 8 USCS § 1101(b)(1).  If an immigrant visa

United States District Court
Northern District of California

17

1   applicant turns 21 before the approval of their application, that applicant is no longer a child for

2   immigration purposes (they are "aged out").  Congress enacted the Child Status Protection Act

3   (CSPA) to prevent children from aging out.  CSPA does not change the statutory definition of a

4   child, but it provides methods for calculating a minor alien's age for immigrant visa purposes (the

5   resulting age is known as the alien's "CSPA age").  CSPA provides that a child's age is frozen on

6   the date a form I-130 was submitted on their behalf.  *See* Child Status Protection Act, 107 P.L.

7   208, 116 Stat. 927, 928, 107 P.L. 208, 2002 Enacted H.R. 1209, 107 Enacted H.R. 1209, § 2 ("a

8   determination of whether an alien satisfies the age requirement in the matter preceding

9   subparagraph (A) of section 101(b)(1) [of the INA] shall be made using the age of the alien on the

10  date on which the petition is filed with the Attorney General under section 204 to classify the alien

11  as an immediate relative"); *see also Determining Child Status Protection Age*, USCIS Policy

12  Manual, https://www.uscis.gov/policy-manual/volume-7-part-a-chapter-7.  However, the April

13  Proclamation only exempts the children of U.S. citizens who are under 21 years old based on their

14  *actual age*, not their CPSA Age.  *See* CAR at 26.  One DOS official claims that consular officers

15  prioritize potential age-out applications.  Marwaha Decl. ¶ 3; *see also* CAR at 000154 (an email,

16  from a redacted sender, issuing guidance from the Visa Office: "[w]e would like to highlight that

17  all age-out cases are considered mission-critical and may continue to be scheduled for

18  appointments as resources allow.  Any urgent age-out case may be eligible for a national interest

19  exception to Presidential Proclamation 10014").  But this is an ad hoc solution for applicants who

20  face irreparable harm.  Applicants who age out forever lose the ability to immigrate to the United

21  States on their approved immigrant visa petitions.  Plaintiffs cite the cases of "Plaintiff Anh Huy

22  Nguyen, who will age out on December 16, 2020, and Plaintiff Vladislave Kaupstin, who will age

23  out on February 14, 2021, among approximately 15 other Plaintiffs who may encounter age-out

24  complications as a result of the Defendants' suspension of visa adjudication."  Resp. at 3-4.

25  Accounts like these, from minors who are mere weeks away from aging out of their approved

26  immigrant visa petitions, show that DOS's "mission critical" prioritization efforts do not have the

27

28

practical effect of alleviating the hardships caused by the Proclamations.[5]

When minor children "age out" of their immigrant visa petitions, they forever lose their ability to immigrate to the U.S. on these approved petitions.  Resp. at 3-4.  This is a unique emotional hardship for some Plaintiffs—they must cope with the prospect that all the effort they invested in reuniting their families may be for naught.  Several of the Plaintiffs seek immigrant visa petitions for their family members in Yemen, who are struggling to survive amidst the humanitarian crisis.  *Id.* at 4.

Further, as noted above, the effect of the Proclamation in freezing the processing and adjudication of their visa applications means that Plaintiffs will consequently suffer a delay in obtaining visas and uniting with their families when the Proclamation does terminate.  The record herein details in human terms the injury.  *See, e.g.*, Sultana Decl. ¶¶ 5, 9 (since her husband became qualified for an immigrant visa application this year, Ms. Sultana has not received an update and experiences severe depression.  She notes: "[m]y husband is extremely disappointed because we never thought this would happen to the immigration system.  My mental condition is horrible.  I have seen a therapist for my anxiety and sadness.  It has been sixteen months since I have seen my husband and I miss him terribly.  Whenever I see my cousins with their spouses, it makes me feel even more down.  I feel there is no joy in my life"); Gabr Decl. ¶¶ 9-10 ("I suffer from hypertension and diabetes, and all the stress has caused me to gain a significant amount of weight.  My health has deteriorated, and I can no longer fly to Egypt to visit.  As a family, we

---

[5] The district court in *Gomez* made a similar finding with respect to Plaintiffs who are Diversity Visa ("DV") lottery selectees.  The DV Plaintiffs in *Gomez* faced similar time constraints as the age-out Plaintiffs in the case at bar: "[i]f the selectee does not receive a visa by the end of the fiscal year, however, he is out of luck: Because the diversity visa program restarts each fiscal year, consular officers may not issue diversity visas after midnight on September 30 of the fiscal year in which the visa applicant was selected."  *Gomez*, 2020 U.S. Dist. LEXIS 163352 at *22 (internal citation and quotation marks omitted).  The court then held that Plaintiffs had shown irreparable harm because they "ha[d] provided a mountain of affidavits attesting to the severe emotional, economic, educational, and personal harms that they and their families [would] imminently experience if Defendants' actions [were] not enjoined by September 30, 2020 [the end of the fiscal year], and they permanently lose their opportunity to immigrate to the United States through the diversity visa program."  The same principal applies to the case at bar: Plaintiffs have submitted numerous affidavits attesting to the severe emotional and economic harm they will experience if the age-out beneficiaries do not have their visa applications processed before they turn 21 years of age, forever losing their ability to immigrate to the United States on those approved petitions.

1   have all dealt with depression because of our separation.  It started from the moment we learned

2   that we had no choice but to be separated"); Kazmi Decl. ¶ 12 (Plaintiff is waiting for his wife's

3   immigrant visa petition to be processed again, and "[t]he stress and anxiety [of being separated]

4   might eventually affect our functionality, causing us to become incapable of performing our

5   routine tasks.  Furthermore, there is a mounting fear that Proclamation 10014 will be extended and

6   further delay my wife's immigration to the United States").

7        As this Court has previously found, family separations and the resulting emotional harm

8   can constitute irreparable hardship for purposes of a preliminary injunction.  *Ramos v. Nielsen*,

9   336 F. Supp. 3d 1075, 1085 (N.D. Cal. October 3, 2018), *rev'd on other grounds*, *Ramos v. Wolf*,

10  975 F.3d 872 (9th Cir. 2020) (Ebtihal Abdalla and her husband are TPS beneficiaries from Sudan

11  [with three children] … Once Sudan's designation is terminated, her husband will be unable to

12  work and, as he is the primary breadwinner, this will have significant impact on the family's

13  livelihood.  Furthermore, since the announcement of Sudan's termination, Ms. Abdalla has

14  suffered bouts of uncontrollable crying and serious migraines.  She has also found it difficult to eat

15  and to leave the house.  She was recently diagnosed with severe depression and prescribed

16  medications").  *Cf. E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 854 (9th Cir. 2020)

17  (discussing harm in requiring those seeking entry to wait in Mexico).

18       Defendants counter that Plaintiffs' delay in filing this motion (*i.e.*, they did not file this

19  motion until October 14, 2020, several months after the April Proclamation) indicates that their

20  purported harm is not irreparable.  Opp. at 22-23.  This argument is not convincing.  As discussed

21  *supra*, these 181 Plaintiffs have immediate family members applying for immigrant visas in 41

22  different countries.  It is no easy feat to collect the requisite information to show irreparable harm

23  from so many individuals with family members many different countries.  Further, the April

24  Proclamation was set to expire after 60 days until the June Proclamation (which was published in

25  the Federal Register on June 25, 2020) extended the expiration date to at least December 31, 2020.

26  The Court does not find that a delay of less than four months—between the June Proclamation and

27  the filing of Plaintiffs' suit in this judicial district—undermines Plaintiffs' claim of irreparable

28  injury.  Nor have Defendants demonstrated any prejudice from this short delay.

United States District Court
Northern District of California

20

1    In sum, Plaintiffs have met their burden of showing that they will suffer irreparable harm

2    in the absence of preliminary relief.

3    2.    Balance of Equities/Public Interest

4    In suits against the government, the balance of equities and public interest prongs merge.

5    *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

6    Defendants argue that the balance of hardships/public interest prong weighs in its favor

7    because the injunctive relief sought by Plaintiffs would disrupt the Diplomacy Strong framework,

8    which was adopted to resume in-person operations in a safe and secure manner.  Opp. at 24 (citing

9    DeGarmo Decl. ¶ 3).  Defendants contend that this "would potentially endanger the lives of

10   Americans, consular staff, and the public who rely on the conditions-based approach to phased in-

11   person operations, which is evaluated at the individual location based on medical and health

12   conditions."  *Id.* (citing DeGarmo Decl. ¶ 5).

13   These arguments are unpersuasive.  First, on July 15, 2020, DOS began a phased approach

14   to the resumption of all visa applications not covered by the Proclamations.  *See* July 8, 2020

15   ALDAC (CAR at 35) ("[b]eginning on July 15, 2020, posts may begin a phased approach to the

16   resumption of routine visa services … [but] posts must adhere to restrictions laid out in any

17   current or subsequent Presidential Proclamation, which may impact the visa services posts are able

18   to provide").  Thus, it appears that consular posts have an increasing capacity to resume

19   processing routine visa applications.  The preliminary injunction can be tailored so as to account

20   for valid pandemic concerns.  For instance, the injunction could simply require DOS to process

21   their applications in a normal order, without the taint of the Proclamations, while still accounting

22   for pandemic based limitations.  *Cf. Gomez,* 2020 U.S. Dist. LEXIS 163352 at *130 ("[t]he court

23   is cognizant of the extreme exigencies caused by the COVID-19 pandemic, and acknowledges that

24   certain consular offices may, for reasons outside Defendants' control, find it impossible to process

25   all pending diversity visa applications by September 30.  But this does not tip the scale against a

26   remedy for Defendants' unlawful conduct, because the court is capable of fashioning a tailored

27   remedy that accounts for these extrinsic limitations").

28   Indeed, even during the formative stages of Diplomacy Strong (*e.g.*, Phases Zero and One),

United States District Court
Northern District of California

21

the July 8, 2020 cable to "All Diplomatic and Consular Posts" ("ALDAC") contemplates the resumption of visa processing as adapted to the conditions of the pandemic: "[p]osts may continue processing any immigrant visa cases previously refused under INA 221(g) that are excepted under P.P. 10014 and can be issued without another personal appearance by the applicant(s), regardless of whether or not they are mission-critical or emergency cases." *See* CAR at 37. If the Court were to disallow DOS's implementation of the Proclamations, Plaintiffs' visa applications could simply be placed back into the queue and adjudicated pursuant to these instructions from DOS: consular posts could process all those applications that "can be issued without another personal appearance by the applicant(s)." Again, Plaintiffs' immigrant visa petitions could be treated the same as any other petitions without disrupting DOS's phased approach to the resumption of routine visa processing.

In contrast to the minimal hardship which DOS would face if it were simply required to treat Plaintiffs' visa petitions without regard to the Proclamation, Plaintiffs face significant hardships in the absence of preliminary injunctive relief (*i.e.*, prolonged family separations, minors forever aging out of their immigrant visa petitions, denial of procedural rights, and the resulting emotional toll). The process has come to a complete standstill for Plaintiffs *as a direct result* of the Proclamations. Embassies and consulates which have resumed operations are processing applications from immigrant visa applicants who are not subject to the Proclamations. *See, e.g.*, Kadiu Decl. ¶ 5 (after his wife was scheduled for an interview with a consular officer in March 2020 in Naples, Italy, Plaintiff states that the process is at a standstill and "we are still waiting due to the presidential proclamation. *The embassy is open and is conducting interviews for the categories not affected by the proclamation*") (emphasis added); Kumar Decl. ¶ 5 ("[t]he L-130 application date was October 11, 2018. The documents were qualified July 30, 2020. *The interview was not scheduled because of the immigration ban, although the consulates are open in India*) (emphasis added); Bejko Decl. ¶ 5 (Plaintiff's husband was scheduled for an interview with a consular officer in March 2020, and "[a]fter Proclamation 10014 on April 22, 2020 and June 24, 2020, everything has stopped"); Mohamed Decl. ¶ 5 ("[a]ll our documents were submitted in May, and the documents were then qualified. With the struggles we had during the USCIS phase and

collecting documents for NVC during the pandemic period, we found ourselves hogtied by the presidential proclamations"); Abad Decl. ¶ 5 ("[o]n September 13, 2020, through the Immigrant Visa Inquiry Form with the US Embassy in Pakistan, I uploaded a request to grant a waiver because my nearly four-year-old daughter, who is a US citizen, is dealing with an extreme emotional hardship due to the absence of her father … [o]n September 17, 2020, *I received an email from the US Embassy stating that they are not processing visas and to refer to Proclamation 10014*") (emphasis added); Patel Decl. ¶ 5 (after the interview of Plaintiff's wife, the consular officer requested more details regarding their marriage, and "[w]e submitted all requested documents, including pictures, on March 16, 2020. *They sent back all documentation we had submitted on September 25, 2020, attaching letters regarding the presidential proclamations*") (emphasis added); Kazemimood Decl. ¶ 5 ("I have just received a letter from the embassy that my father's visa was refused under the proclamation titled "Suspending Entry of Immigrants Who Present Risk to the US Labor Market During the Economic Recovery Following the COVID-19 Outbreak." … My father's visa was in administrative processing and I received the email regarding the labor ban in October 2020. The whole process from filing the I-130 until now has taken four years. If the process was performed in a timely manner, my dad would not be facing this ban for his visa"); Veleulov Decl. ¶ 5 ("As an F2A category, we are now subject to the Presidential Proclamation of suspended immigration. *That is why we still did not get our interview appointment in Moscow*") (emphasis added); Ghezeljeh Decl. ¶ 5 ("[o]n July 8, 2020, we got notified that the administrative processing of my mother's case is finalized. However, *due to the Presidential Proclamation 10014 issued on April 22, 2020 and continued by Presidential Proclamation 10052 on June 22, 2020, they were not able to process her case*") (emphasis added).

In sum, Plaintiffs have suffered direct repercussions from the enactment of the Proclamations: their immigrant visa applications are not being processed, even in countries where embassies and consulates have resumed routine visa applications. They will also suffer delay in obtaining their ultimate goal of attaining visas and entering into the United States. The freeze imposed by DOS's No Visa policy under its Diplomacy Strong framework has exacerbated the hardships they already face, and the balance of hardships tilts strongly in their favor.

23

1

2

3       3.      Serious Questions Going to the Merits

        If Plaintiffs are able to show that the balance of hardships tips sharply in their favor, then

they need only show serious questions on the merits have been raised in order to obtain

preliminary injunctive relief under this Circuit's sliding scale variation of the *Winter* standard.

*All. for the Wild Rockies*, 865 F.3d at 1217.

        a.      INA Claims

        Congress has delegated authority to the President to suspend or restrict the entry of aliens

in certain circumstances.  The principal source of that authority is § 1182(f) of the INA, which

provides: "[w]henever the President finds that the entry of any aliens or of any class of aliens into

the United States would be detrimental to the interests of the United States, he may by

proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or

any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any

restrictions he may deem to be appropriate."  8 U.S.C. § 1182(f).  Plaintiffs challenge the

permissibility of the Proclamations as exceeding the President's authority under § 1182(f).

        The starting point for the Court's Constitutional inquiry is *Trump v. Hawaii*, 138 S. Ct.

2392 (2018) ("*Hawaii III*"), which held that § 1182(f) "exudes deference" to the President to

suspend the entry of aliens for foreign policy and national security reasons.  *Id.* at 2408.  When

acting under these rationales, the President's decision to exclude aliens is analyzed under a

forgiving rational basis standard of review.  *Id.* at 2420 (asking "whether the entry policy is

plausibly related to the Government's stated objective to protect the country and improve vetting

processes").

        Notwithstanding *Trump v. Hawaii*, the Court finds that Plaintiffs raise serious

Constitutional questions on the merits.  Unlike the Proclamation at issue in *Hawaii III*, the April

and June Proclamations are grounded purely on domestic rationales (*i.e.*, protecting the struggling

U.S. economy amidst the pandemic).  Where executive action under § 1182(f) is taken for reasons

grounded in domestic policy, and not on international affairs and national security, a less

deferential standard of review applies.  As the Ninth Circuit explained in *Doe v. Trump*, 957 F.3d

1050, 1067 (9th Cir. 2020), ("*Doe #1*"), in *Hawaii III*, "the President acted within the traditional

spheres authorized by § 1182(f): in the context of international affairs and national security, and working in tandem with the congressional goals of vetting individuals from countries identified as threats through an agency review.  By contrast, the Proclamation here deals with a purely domestic economic problem: uncompensated healthcare costs in the United States … [and, in this context] *his power is more circumscribed when he addresses a purely domestic economic issue*" (emphasis added).  *See also Ramos v. Wolf*, 975 F.3d 872, 895 (9th Cir. 2020) ("the deferential standard of review applied in *Trump v. Hawaii* turned primarily on the Court's recognition of the fundamental authority of the executive branch to manage our nation's foreign policy and national security affairs without judicial interference"); *NAM*, 2020 U.S. Dist. LEXIS 182267 at *21 ("[i]n contrast to the Muslim Proclamation that was before the Supreme Court in *Hawaii III*, the Proclamation here deals with a purely domestic economic issue — the loss of employment during a national pandemic … [and] [t]his Court rejects the position that the Proclamation implicates the President's foreign affairs powers simply because it affects immigration").

To be sure, the district court in *Gomez*, 2020 U.S. Dist. LEXIS 163352 at *77-78 held otherwise ("even if Plaintiffs' foreign/domestic dichotomy is a practically feasible one, it does not follow that judicial deference is any less when the overarching purpose for the exclusion of aliens is domestic in nature … [for] [t]he wisdom of the President's decision to address those changed circumstances [caused by the COVID-19 pandemic] by restricting the entry of certain classes of aliens is a policy decision the judiciary is not well equipped to evaluate").  But this Court is bound by Ninth Circuit law.

In the case at bar, Defendants' only justifications for the restriction on entry for approved immigrant visa applicants are conclusory statements in the April and June Proclamation Preambles concerning the unemployment rate and the allegedly deleterious effects of newly arrived immigrants on struggling American workers.  The only semblance of an official agency review process is the following passage in the Preamble to the June Proclamation: "[i]n addition, pursuant to Proclamation 10014, the Secretary of Labor and the Secretary of Homeland Security reviewed nonimmigrant programs and found the present admission of works within several nonimmigrant visa categories also poses a risk of displacing and disadvantaging United States workers during the

1   current recovery."  The June Proclamation Preamble cites various statistics concerning the

2   millions of jobs lost by American workers in industries where employers are looking to hire non-

3   immigrant workers.  CAR at 5-6.  However, the Preamble does not address why it is necessary to

4   bar entry of *immigrant* visa applicants, the beneficiaries of U.S. citizens and LPR's already

5   residing in the country who seek admission not as, *e.g.*, workers with specialized knowledge under

6   an H-1B visa, but as family members seeking to unite with their loved ones.  There is no finding

7   that these immigrants present a net economic dislocation for American workers.

8          Further, the Administrative Record is barren of any evidence of the purported economic

9   dislocation caused by this group of immigrants.  It has been argued that these beneficiaries provide

10  a net benefit to the U.S. economy by reuniting families and thereby providing economic stability

11  for U.S. citizens and LPR's.  In fact, Congress expressly considered the impact of family-based

12  immigration on the labor market when it created the modern-day family preference visa system.

13  For instance, at the time that Congress drafted and enacted the Immigration Act of 1990, it relied

14  on the nation's top economists to conclude that increased family-based immigration benefits the

15  U.S. economy.  *See* H.R. Rep. No. 101-723, pt. 1 (1990), as reprinted in 1990 U.S.C.C.A.N. 6710,

16  6717.

17         The record here stands in stark contrast to that in *Hawaii III*, where the President's

18  determination came after a comprehensive interagency review process which determined whether

19  countries around the globe met a "baseline" of adequate vetting procedures.  *See Hawaii III*, 138

20  S. Ct. at 2408 (finding that the government made the "prerequisite" showing that the covered

21  aliens would be detrimental to the interests of the U.S. by, *e.g.*, "order[ing] DHS and other

22  agencies to conduct a comprehensive evaluation of every single country's compliance with the

23  information and risk assessment baseline" and, based on that review "f[inding] that it was in the

24  national interest to restrict entry of aliens who could not be vetted with adequate information").

25  There is nothing in the Administrative Record which indicates that the U.S. Departments of State,

26  Homeland Security, or Labor engaged in the same kind of information-gathering process

27  concerning the effect of immigrant visa beneficiaries on the recovering economy.  *Cf. NAM*, 2020

28  U.S. Dist. LEXIS 182267 at *32-33 ("[a]lthough facially the President's determination [in the

United States District Court
Northern District of California

1    June Proclamation Preamble] appears to be a finding as required by Section 1182(f), there is

2    nothing proffered in the record that any such reviews were made by the Secretaries of Labor or

3    Homeland Security, and no reports of any sort that a specific determination was made that

4    nonimmigrant visa applicants had any deleterious effect on the United States economy or

5    American citizens' employment rates").

6        An agency which changes its course "must supply a reasoned analysis." *Motor Vehicle*

7    *Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57, 103 S. Ct. 2856, 2874 (1983); *see*

8    *also Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 690 (9th Cir. 2007) ("an

9    agency changing its course must supply a reasoned analysis … [and] BPA [Bonneville Power

10   Administration, the federal agency at issue] departed from its two-decade-old precedent without

11   supplying a reasoned analysis for its change of course") (internal citation omitted).  There are no

12   factual findings in the Administrative Record which show a reasoned analysis from the

13   Departments of State, Homeland Security, or Labor with respect to their decision to freeze the

14   immigrant visa applications of applicants who are otherwise qualified to be united with their

15   families.

16       At the very least, Plaintiffs' constitutional challenge to the Proclamations as exceeding the

17   President's authority under § 1182(f) raise serious questions on the merits.[6]

18           b.    APA Claims

19       Plaintiffs also state a substantial claim that DOS's implementation of the Proclamations is

20   "not in accordance with law" under APA § 706(2).  In particular, they contend that DOS's

21   implementation exceeds the scope of the Proclamation, which addresses only *entry* of immigrants

22   but does not enjoin the processing and issuance of visas.  Absent the Proclamations, there is no

23   legal basis to categorically lock down the processing of visas where there is an approved

24   immigrant visa petition.

25       Defendants argue that their implementation of the Proclamations is reasonable.  They note

26   that the Diplomacy Strong framework was approved by the Under Secretary of State for

27

28   _____
     [6] The Court therefore need not reach the question of whether the Proclamations contravene the
     INA's establishment of the family-based preference system and priorities of immigrant visas.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Management, pursuant to the authority (delegated to him by the Secretary of State) to "administer,

2    coordinate, and direct the Foreign Service of the United States and the personnel of the

3    Department of State, except where such authority is inherent in or vested in the President."  Opp.

4    at 3 (citing 22 U.S.C. § 2651a (a)(3)(A)).  Thus, the Secretary has wide discretion in exercising

5    this authority to implement the Proclamations, particularly when he is responsible for over 300

6    U.S. missions worldwide and must allocate consular resources to process over 110 classifications

7    of immigrant and nonimmigrant visas during a global pandemic.  Opp. at 17.

8         Defendants also argue that the No Visa Policy of the Diplomacy Strong framework is an

9    automatic consequence of the INA—under 8 U.S.C. § 1201(g)—and therefore does not violate the

10   APA.  *Id.*  Defendants contend that, when the President imposes restrictions on the entry of aliens

11   pursuant to a Presidential Proclamation enacted under § 1182(f), subsection 1201(g) mandates that

12   a consular officer cannot lawfully issue an immigrant visa to an applicant who is covered by the

13   Proclamation.  *Id.*

14        Subsection 1201(g) provides "[n]o visa … shall be issued to an alien if … it appears to the

15   consular officer … that such alien is ineligible to *receive* a visa or such other documentation under

16   section 1182."  8 U.S.C. § 1201(g) (emphasis added).  Defendants therefore conflate admissibility

17   determinations and entry determinations.  Subsection 1201(g) governs whether applicants are

18   eligible to receive a visa, in tandem with § 1182(a), which prescribes a number of reasons why an

19   alien abroad may be deemed ineligible to receive a visa, *e.g.*, on health-related or criminal

20   grounds.  *See* 8 U.S.C. § 1182(a) ("[e]xcept as otherwise provided in this Act, aliens who are

21   inadmissible under the following paragraphs are ineligible to *receive* visas and ineligible to be

22   admitted to the United States") (emphasis added).  Entry determinations, in contrast, are governed

23   by § 1182(f).  8 U.S.C. § 1182(f) ("[w]henever the President finds that the *entry* of any aliens or of

24   any class of aliens into the United States would be detrimental to the interests of the United States,

25   he may by proclamation, and for such period as he shall deem necessary, suspend the *entry* of all

26   aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any

27   restrictions he may deem to be appropriate) (emphasis added).

28        To conflate admissibility and entry is to ignore "the basic distinction between admissibility

28

determinations and visa issuance that runs throughout the INA." *Hawaii III*, 138 S. Ct. at 2414 & n.3 (collecting examples); *see also Castaneda-Gonzalez v. Immigr. & Naturalization Serv.*, 564 F.2d 417, 426 (D.C. Cir. 1977) (explaining that § 1201(g) of the INA directs consular officers "not to issue visas to any alien who falls within one of the excludable classes described in [§ 1182(a)]").  Plaintiffs in the case at bar are merely prohibited from *entering* the United States by the Proclamations.  They have not been deemed ineligible to *receive a visa*.  That determination is made by a consular officer based on, *inter alia*, the grounds described in § 1182(a).  Nothing in §1182(a) makes the plaintiffs categorically barred from receiving a visa.  Indeed, their visa petitions have already been approved.

Apart from § 1201(g), Defendants identify no statutory authority that would authorize consular officers to cease processing and adjudicating qualifying visas.  In fact, the INA directs that applications be adjudicated at the end of the immigrant visa application process, and DOS's Foreign Affairs Manual explicitly prohibits consular officers from holding immigrant visa applications in abeyance.  *See* 9 FAM 504.1-3 ("IV Application Processing") at g. ("Adjudications") ("[o]nce an application has been executed, the consular officer must either issue the visa or refuse it.  *A consular officer cannot temporarily refuse, suspend, or hold the visa for future action*") (emphasis added); 8 U.S.C. § 1202(b) ("[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular officer"); *see also* 22 C.F.R. § 42.81(a) ("[w]hen a visa application has been properly completed and executed before a consular officer in accordance with the provisions of the INA and the implementing regulations, the consular officer *must* issue the visa, refuse the visa under INA 212(a) or 221(g) or other applicable law or, pursuant to an outstanding order under INA 243(d), discontinue granting the visa").

The Court's holding on Plaintiffs' APA claims is distinct from the Constitutional matter.  Indeed, the district court in *Gomez* found that the Proclamations are Constitutional under § 1182(f), but that DOS's implementation of the Proclamations ran afoul of the APA, for the same reason: "[t]he categories of persons deemed ineligible to receive a visa pursuant to § 1201(g) appear in § 1182(a), not § 1182(f) … A suspension of entry under § 1182(f) therefore has no bearing on whether the person is 'inadmissible' under § 1182(a) or ineligible to receive a visa

29

under § 1201(g)." *Gomez*, 2020 U.S. Dist. LEXIS 163352 at *106-07.  It held that "[b]ecause Defendants have not identified any statutory authority that would permit the suspension of this ordinary process [for visa applications], the court concludes that Plaintiffs are likely to succeed on the merits of their claim that Defendants' No-Visa Policy is not in accordance with law and in excess of statutory authority." *Id.* at *112-13 (internal citations omitted).  The same logic applies to the case at bar.  Defendants have identified no apt statutory authority that permits DOS to suspend the processing of visa applications for applicants who are covered by the Proclamation.

The Court does not dispute the Secretary's authority to direct DOS personnel and the U.S. Foreign Service in the midst of a global pandemic, pursuant to his statutory authority under § 2651a (a)(3)(A).  22 U.S.C. § 2651a (a)(3)(A) ("[t]he Secretary shall administer, coordinate, and direct the Foreign Service of the United States and the personnel of the Department of State, except where authority is inherent in or vested in the President").  But that authority, at least in the absence of a legally valid Presidential directive, does not permit the Secretary to enact a complete and categorical suspension of the processing of eligible visa applications, irrespective of pandemic conditions.  When consular officers are directed to suspend the ordinary immigrant visa process (for applicants who are eligible to receive a visa) for reasons not dictated by resource limitations caused by urgencies such as the pandemic, and when such officers act without color of a valid Presidential directive or any other statutory authority, DOS acts "not in accordance with law" and "in excess of statutory … authority."  5 U.S.C. § 706(2)(A), (C).  Thus, Plaintiffs have raised serious questions going to the merits with respect to their APA claims and are entitled to preliminary injunctive relief on this ground as well.

### III.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for Preliminary Injunctive Relief and **DENIES** Defendants' Motion to Transfer.  Plaintiffs seek to enjoin application of the Proclamations with respect to their petitions only, and do not seek a nationwide injunction.  Mindful of the realities of the pandemic and the need to preserve and protect the health and safety of consulate and embassy personnel, IT IS HEREBY ORDERED THAT:

1.     Defendants, their agents, servants, employees, and all others in active concert or

1   participation with them are enjoined, pending final judgment, from implementing, enforcing, or

2   otherwise carrying out Section 1 of Proclamation 10014 and Defendants' No-Visa Policy with

3   respect to Plaintiffs herein.

4         2.     Defendants, their agents, servants, employees, and all others in active concert or

5   participation with them are enjoined, pending final judgment, from engaging in any action that

6   results in the non-processing and non-issuance of applications or petitions for immigrant visas of

7   the Plaintiffs which, but for Proclamation 10014 (which was extended by Proclamation 10052)

8   and the No-Visa Policy, would be eligible for processing and issuance.  Defendants shall

9   undertake good-faith efforts to effectuate the processing of Plaintiffs' visas, provided, however,

10   that this order shall not prevent any embassy personnel, consular officer, or administrative

11   processing center from prioritizing the processing, adjudication, or issuance of visas based on

12   resource constraints, limitations due to the COVID-19 pandemic, or country conditions, so long as

13   such decisions are not informed or effected by Proclamation 10014 or Defendants' No-Visa

14   Policy.

15         3.     This preliminary injunction shall take effect immediately and shall remain in effect

16   pending trial in this action or further order of this Court.

17         This order disposes of Docket Nos. 8 and 18.

18   

19         **IT IS SO ORDERED**.

20   

21   Dated: December 11, 2020

22   

23   _____

24   EDWARD M. CHEN
     United States District Judge

25   

26   

27   

28   

*United States District Court*
*Northern District of California*